UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN LAWRENCE,<br><br>                    Plaintiff,<br><br>-against-<br><br>THOMAS MICHAEL FLOHR,<br><br>                    Defendant. | Case No.: 23-cv-9844<br><br>**COMPLAINT** |

Plaintiff STEPHEN LAWRENCE, by and through undersigned counsel, as and for his complaint against Defendant THOMAS MICHAEL FLOHR, alleges as follows.

## NATURE OF THE ACTION

1. This Action concerns Defendant's breach of an escrow agreement with Plaintiff in connection with Plaintiff's failed purchase of Bitcoin, whereby Defendant caused the value of $1.195 million in Plaintiff's escrowed United States Dollar Tether ("USDT") to be released to a third-party without Plaintiff's consent and without Plaintiff having received the bargained-for Bitcoin.

2. After Defendant breached the escrow agreement, Defendant lied to Plaintiff about the whereabouts of the lost USDT in breach of Defendant's fiduciary obligations to Plaintiff as Plaintiff's escrow agent.

3. As a direct result of Defendant's misconduct, Plaintiff has sustained damages in an amount to be determined at trial but not less than $1.195 million.

## PARTIES

4. Plaintiff Stephen Lawrence ("Plaintiff" or Lawrence") is a natural person residing in the United Kingdom.

5. Defendant Thomas Michael Flohr ("Defendant" or "Flohr") is a natural person residing in the State of New York, County of Westchester.

**RELEVANT NON-PARTIES**

6. Upon information and belief, non-party Allyn Lloydell Brennan ("Brennan") is a natural person residing in the State of Florida.

7. Upon information and belief, non-party New RiverBank LLC ("RiverBank") is a limited liability corporation organized and existing under the laws of the State of Florida with its principal office in Fort Lauderdale, Florida.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction pursuant to Section 7.2 of the parties' escrow agreement ("Escrow Agreement") whereby Defendant irrevocably submitted to the jurisdiction of any Federal Court sitting in the Southern District of New York pertaining to controversies arising out of or relating to the Escrow Agreement.

9. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 (a)(2), as Defendant is a citizen of New York State and Plaintiff is a citizen of the United Kingdom, and the amount in controversy exceeds the statutory threshold set forth in 28 U.S.C. § 1332 (b).

10. Venue is proper in this District pursuant to the Escrow Agreement's forum selection clause, Section 7.2, and pursuant to 28 U.S.C. § 1391(b)(2).

**FACTUAL ALLEGATIONS**

11. Cryptocurrency is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange; (2) a unit of account; and/or (3) a store of value but does not have legal tender status.

12. Unlike fiat currency, like the U.S. Dollar and the Euro, cryptocurrency is not issued by any jurisdiction and functions only by agreement within its community of users.

13. Bitcoin (or, "BTC") is a form of cryptocurrency which is a decentralized, peer-to-peer, form of electronic currency.

14. USDT is a form of cryptocurrency known as a "stablecoin."

15. Stablecoin cryptocurrency is valued based on the value of a referenced asset, such as another currency, commodity, or other financial instrument.

16. As relevant to this Action, USDT stablecoin uses the U.S. Dollar as a reference asset, meaning that USDT is valued at a 1:1 rate to the U.S. Dollar.

17. At all relevant times, Plaintiff was engaged in the business of purchasing Bitcoin, and Defendant was Plaintiff's escrow agent to facilitate the purchase.

18. Specifically, on or about December 12, 2022, Plaintiff entered into a Sales and Purchase Agreement ("SPA") with non-party Brennan.

19. Pursuant to the SPA, Plaintiff as buyer and Brennan as seller agreed that Plaintiff would purchase from Brennan set amounts of Bitcoin in exchange for the transfer to Brennan by Plaintiff of adequate consideration in the form of USDT ("Transaction").

20. The Transaction was also to use USDT as collateral held by an escrow agent who would release the collateral to Brennan in the event that Brennan transferred the Bitcoin to Plaintiff but Plaintiff did not transfer adequate USDT consideration as stated in the SPA.

21. Under the SPA, Plaintiff's purchase of BTC was to be executed for a contract volume of up to 50,000 BTC at an anticipated rate of 10 trades per day. *See* Exh A.

22. The initial tranche size would equal 104.5% of the value held in escrow to the seller, which was agreed at $1,200,000. *See id.*

23. The SPA required Plaintiff's collateral USDT to be escrowed in order to secure the Transaction, and in the event of non-settlement of any BTC tranche Plaintiff received on any given trade day, the seller could call on the release of the escrowed funds in lieu of payment.

24. Plaintiff entered into the Escrow Agreement with Defendant as Plaintiff's escrow agent in the Transaction on or about December 14, 2022.

25. The Escrow Agreement states that Plaintiff would transfer USDT in the amount of 1,195,000 to Defendant ("Escrow Sum"), and that Defendant would release Plaintiff's Escrow Sum to Brennan only under the following condition: where Plaintiff received Brennan's Bitcoin and failed to directly transfer the non-escrowed USDT consideration to Brennan therefor.

26. The Escrow Agreement establishes Defendant's obligations as escrow agent related to the Transaction.

27. Plaintiff transferred the Escrow Sum to Defendant on or about December 16, 2022.

28. Thereafter, Brennan failed to transfer Brennan's Bitcoin to Plaintiff.

29. Plaintiff did not receive Brennan's Bitcoin from any other person at any time.

30. Defendant willfully failed to safeguard the Escrow.

31. On or about December 16, 2022, Defendant permitted the Escrow Sum to be released to Brennan.

32. Defendant permitted the Escrow Sum to be released to third parties.

33. Defendant actively participated in the release and loss of the Escrow Sum.

34. Specifically, Defendant transferred the Escrow Sum to a third-party's digital wallet administered by non-party Riverbank.

35. To date, the Escrow Sum has not been returned to Plaintiff.

36. Defendant did not have permission to release the Escrow Sum or access to the Escrow Sum to any person except as pursuant to the Escrow Agreement.

37. Under the Escrow Agreement, Plaintiff was to transfer the Escrow Sum in USDT to Defendant's USDT ERC20 digital wallet, which served as the account to hold the Escrow ("Escrow Account").

38. Defendant's Escrow Account is protected by a unique address designated by a string of letters and numbers.

39. Only a unique "private key" associated with the digital wallet Escrow Account can access the cryptocurrency USDT Escrow in that digital wallet Escrow Account.

40. However, any individual can send cryptocurrency to any digital wallet.

41. An individual does not have to submit any identifying information to any central authority to own an electronic wallet, and therefore, an individual can easily hold a digital wallet anonymously.

42. Whenever someone transfers cryptocurrency between digital wallet addresses, it is recorded on a blockchain, which is a publicly distributed electronic ledger.

43. The blockchain records only the movement of cryptocurrency between the addresses; it does not identify the holders of the cryptocurrency by the digital wallets.

44. The blockchain primarily involved in this Action is the Bitcoin blockchain.

45. Pursuant to Section 1.1 of the Escrow Agreement, Defendant is Plaintiff's trustee and fiduciary in respect of the Escrow Account.

> The Buyer and the Seller hereby appoint the Escrow Attorney as agent under this Agreement and the Escrow Attorney accepts such appointment as depository and administrator of the USDT and/or BTC to be exchanged as set out in this Agreement and other related agreements and/or invoices. Except as may be otherwise provided by this Escrow Agreement, the Escrow Attorney shall (in relation to

> the Escrow Account and generally) act as a trustee and as the agent of the Buyer and the Seller. It is understood and agreed that the duties of the Escrow Attorney are only as specifically provided herein and are purely ministerial and fiduciary in nature.

See Exh. B, § 1.1.

46. The Escrow Agreement further provides, in pertinent part:

> The Escrow Sum will be held in the Escrow Account on the terms of this Escrow Agreement, and no amount may be released from the Escrow Account otherwise than on the terms of this Escrow Agreement.
>
> The Escrow Sum is to be held by the Escrow Attorney as a collateral:
>
> In the event of nonpayment of a BTC tranche by the Seller to the Buyer, the Buyer will have an option to call on the Escrow Sum ("Buyer's Claim") no sooner than 24 hours following the event of nonpayment.

See Exh. B, §§ 2.1; 2.2; 2.2.2.

47. In the event of a Buyer's Claim made by Plaintiff, Defendant as Escrow Attorney is obligated to release and return the Escrow Sum to Plaintiff within 24 hours. *Id.* § 3.2.

48. At all relevant times, the Escrow Account itself is required to be held under the control of Defendant as the Escrow Attorney. *Id.* § 4.1.

49. The Escrow Agreement is not assignable without the written consent of Plaintiff, nor may it be modified or amended without the written consent of Plaintiff. *Id.* § 8.2.

50. On or about December 16, 2022, in accordance with the SPA, Plaintiff transferred the Escrow Sum amount of $1,195,000 in USDT to the Escrow Account.

51. On December 16, 2022 at 15:53 GMT (London); or 11:53 a.m. EST, Defendant confirmed he received the Escrow Sum deposited in his Escrow Account.

52. On or about December 16, 2022, Plaintiff provided the seller, non-party Brennan, with a purchase invoice to purchase 74.3229972622307 BTC, valued at $1,248,775 USD.

6

53. Some hours thereafter, the Escrow Sum disappeared from the Escrow Account.

54. No transfer of BTC was made from the seller, non-party Brennan, to Plaintiff's digital wallet on December 16, 2022 or on any day since.

55. On December 22, 2022, six days after the initial deposit of the Escrow Sum, Plaintiff initiated a Buyer's Claim under the Escrow Agreement for the release and return of the Escrow Sum to Plaintiff.

56. Defendant responded to the Buyer's Claim that same day, in pertinent part:

> As you have been informed, the subject USDT, without my knowledge, permission, or instruction, was sent by an employee of the bank administering the wallet to another USDT wallet … I am sure you understand that a USDT wallet administered by a bank is not wholly within an escrow attorney's control, as even traditional bank fiat escrow accounts are not wholly within an escrow attorney's control, and any liability here lies with the bank.

*See* Exhibit C.

57. Prior to Defendant's response to the Buyer's Claim, Defendant never revealed to Plaintiff that a third party administered the Escrow Account digital wallet.

58. The Escrow Agreement permits Escrow Sum administration by Defendant only.

59. Defendant never sought nor received Plaintiff's consent to assign Defendant's trustee and fiduciary obligation of safeguarding the Escrow Account to a third party.

60. Prior to the transfer of the Escrow Sum to Defendant, Defendant represented to Plaintiff that the Escrow Account would be solely managed and administered by Defendant.

61. At no point prior to receipt of Defendant's response letter to the Buyer's Claim was Plaintiff notified of a transfer of any funds from the Escrow Account to another USDT wallet.

62. Defendant did not seek nor have Plaintiff's permission to transfer USDT from the Escrow Account, nor was Defendant permitted to do so under the Escrow Agreement.

63. In the months following, Defendant actively concealed the identity of the third-party "bank" purportedly used to manage the Escrow Account, non-party Riverbank.

64. Defendant demanded Plaintiff enter into a Hold Harmless agreement with Defendant to release Defendant from liability arising from the loss of the Escrow Sum in exchange for Defendant's disclosure of the identity of the third-party "bank."

65. Plaintiff did not sign the Hold Harmless agreement with Defendant.

66. Upon information and belief, Riverbank is a Florida LLC and is not registered as a "bank" with the FDIC.

67. In or around October 2023, Defendant provided to Plaintiff a claim Defendant purportedly made to the Federal Bureau of Investigations pertaining to the lost Escrow Sum ("FBI Claim").

68. Content in Defendant's FBI Claim revealed that non-party seller, Brennan, was permitted access to the Escrow Sum by Defendant to use as consideration to exchange with an unknown third-party who received the Escrow Sum as administered by RiverBank.

69. Defendant's FBI Claim alleges that the Escrow Sum was subsequently deposited into Binance, a cryptocurrency exchange.

70. Defendant was at all relevant times an attorney admitted to practice law in the State of New York.

71. At all relevant times, Defendant served as an advisor and attorney-at-law to non-party seller Brennan, who remained Defendant's client in connection with the Transaction.

72. At all relevant times, Defendant was Brennan's lawyer.

73. At all relevant times, Defendant catered to and served Brennan's interest at the expense of Plaintiff's interest in the Transaction, and in breach of Defendant's fiduciary obligations to Plaintiff related to the Escrow Sum.

74. Upon information and belief, Brennan instructed Defendant to permit the transfer of the Escrow Sum to an unknown third-party for Brennan's use in connection with an unrelated transaction between Brennan and such third-party.

75. Upon information and belief, Brennan instructed Defendant to permit or suffer the transfer of the Escrow Sum to an unknown third-party Brennan's use of the Escrow Sum in connection with an unrelated transaction between Brennan and such third-party.

76. Such unknown third-party obtained the Escrow Sum by the allowance and permission of Defendant.

77. The identity of such third-party is unknown to Plaintiff.

78. The Transaction between Plaintiff and non-party Brennan was never completed.

79. To date, Defendant refuses to return to Plaintiff the $1,195,000 value of USDT in breach of the Escrow Agreement.

### FIRST CAUSE OF ACTION
**Breach of Contract**

80. Plaintiff repeats and realleges all the preceding allegations as though fully set forth herein at length and further alleges as follows.

81. The Escrow Agreement constitutes a valid and binding contract between Plaintiff and Defendant.

82. Plaintiff fully performed under the Escrow Agreement.

83. Defendant breached the Escrow Agreement.

84. Under the terms of the Escrow Agreement, Plaintiff appointed Defendant as the "Escrow Attorney" and, as Escrow Attorney, Defendant accepted appointment as depository and administrator of the USDT Escrow Sum. *See* Exhibit B §1.1.

85. The Escrow Agreement explicitly states that "[t]he Escrow Sum is to be held by the Escrow Attorney as a collateral" (*id.* §2.2), and that "[t]he Escrow Account [] shall be under the control of the Escrow Attorney" (*id.* § 4.1).

86. As Escrow Attorney, Defendant was required to maintain and administer the Escrow Account and to safeguard the Escrow Sum in the event of non-settlement of the underlying Transaction.

87. By Defendant's admission in response to the Buyer's Claim dated December 22, 2022, Defendant purportedly permitted a third party to administer the Escrow Account.

88. This third party purportedly had the capacity to access the Escrow Account and transfer USDT funds out of the Escrow Account. *See* Exh. C.

89. Based on information contained in the FBI Claim, authored by Defendant, Defendant appears to have permitted his client, non-party Brennan, to access the Escrow Account and/or Escrow Sum for Brennan's conversion of same to Brennan's own use in an unrelated transaction with an unknown third party.

90. By permitting third party/ies to access and control the Escrow Account, Defendant failed to personally hold, administer, and control the Escrow Account in breach of the Escrow Agreement.

91. The Escrow Agreement further provides that "[t]his Agreement is not assignable without the written consent of all Parties" (Exh. B § 8.2).

92. Defendant breached the Escrow Agreement by purported assignment and/or delegation of his trustee and fiduciary obligation to administer the Escrow Account by assignment and/or delegation of such obligation to non-party RiverBank.

93. Defendant did not obtain, nor did he seek, permission from Plaintiff to assign Defendant's Escrow Sum administration obligation.

94. The Escrow Agreement further provides that "[t]he Escrow Sum will be held in the Escrow Account on the terms of this Escrow Agreement, and no amount may be released from the Escrow Account otherwise than on the terms of this Escrow Agreement" (Exh. B § 2.1) and that "[t]he Escrow Attorney shall withdraw from the Escrow Accounts only in accordance with this Agreement" (*id.* § 4.2).

95. Following Plaintiff's transfer of the Escrow Sum on December 16, 2022, USDT funds were transferred out of the Escrow Account despite non-settlement of the underlying Transaction, in clear violation of the conditions of the Escrow Agreement necessary for the transfer of the Escrow Sum.

96. Under the Escrow Agreement, "[w]here a Claim is made[,] the Escrow Attorney shall release and pay the Escrow Sum to the respective Party within 24 hours" (Exh. B § 3.2).

97. Due to the non-settlement of the underlying Transaction, Plaintiff exercised his right to initiate a Buyer's Claim under Escrow Agreement, Section 2.2.2, on December 22, 2022.

98. Defendant failed to return to Plaintiff the Escrow Sum within 24 hours, as is required by the Escrow Agreement, Section 3.2.

99. To date, Defendant has not returned any portion of the Escrow Sum.

100. Defendant's misconduct in breach of the Escrow Agreement rises to the level of willful misconduct or gross negligence.

101. As a direct and proximate result of the above-referenced breaches of the Escrow Agreement by Defendant, Plaintiff has been injured and sustained damages in an amount to be determined at trial, but in no event less than $1,195,000.

## SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty

102. Plaintiff repeats and realleges all the allegations in the preceding paragraphs as though fully set forth herein at length and further alleges as follows.

103. As Plaintiff's escrow agent, Defendant owed fiduciary duties to Plaintiff to hold in trust the Escrow Sum as Plaintiff's fiduciary and to release the Escrow Sum only in the event that Plaintiff received the BTC and did not pay for same to the non-party seller.

104. This fiduciary duty is established by relevant case law as well as the Escrow Agreement, which provides that "the Escrow Attorney shall… act as a trustee and as the agent of [Plaintiff] and seller. It is understood and agreed that the duties of the Escrow Attorney are … fiduciary in nature" (Exh. B §1.1).

105. Flohr's duty of candor extended to his duty to disclose material information about the third-party/ies to whom Defendant provided access to, and/or control over the Escrow Account and/or the Escrow Sum, including Defendant's client (Brennan), and RiverBank.

106. Following the unauthorized transfer of Escrow Sum from the Escrow Account, Plaintiff repeatedly demanded from Defendant the name(s) of person(s) who accessed Defendant's Escrow Account and looted the Escrow Sum.

107. Defendant lied to Plaintiff affirmatively and by omission.

108. First, Defendant would not tell Plaintiff about RiverBank (including its identity) unless Plaintiff agreed to hold Defendant harmless for Defendant's loss of the Escrow Sum.

109. Then, months later, Defendant told Plaintiff RiverBank took the Escrow Sum.

110. Over the months following the unauthorized transfer of Escrow Sum, Plaintiff requested that Defendant provide him with details of the due diligence performed on New RiverBank and Defendant has failed to do so.

111. Then, months after that, Defendant disclosed to Plaintiff the FBI Claim in which it appears that Defendant permitted his client Brennan to take the Escrow Sum, which RiverBank then subsequently administered in connection with an unrelated transaction.

112. Defendant's actions rise to the level of gross negligence and willful misconduct.

113. Defendant failed to adhere to his duty of candor as fiduciary to Plaintiff and instead held material information hostage in exchange for a Hold Harmless agreement, which Plaintiff never signed.

114. By failing to disclose the identity of RiverBank and that Defendant apparently permitted his client Brennan to control the Escrow Sum without Plaintiff's permission, Defendant violated his fiduciary duty of candor.

115. Defendant's fiduciary breaches evidence willful misconduct or gross negligence.

116. As a direct and proximate result of Defendant's breaches of his fiduciary obligations to Plaintiff, Plaintiff has been damaged in an amount to be determined at trial, in no event less than $1,195,000.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment as follows:

A. On the FIRST CAUSE OF ACTION, damages in the sum of not less than $1,195,000.00 plus interest, costs, attorneys' fees, and punitive damages with the precise amount to be determined at the time of trial;

B.	On the SECOND CAUSE OF ACTION, damages in the sum of not less than $1,195,000.00 plus interest, costs, attorneys' fees, and punitive damages with the precise amount to be determined at the time of trial;

C.	Such other and further relief as the Court deems just and proper.

Dated: New York, New York
November 7, 2023

**WOODS LONERGAN PLLC**

*Annie E. Causey*
Annie E. Causey, Esq. (AC5795)
James F. Woods, Esq. (JW3211)
60 East 42nd Street, Suite 1410
New York, New York 10165
(212) 684-2500
acausey@woodslaw.com
jwoods@woodslaw.com
*Attorneys for Plaintiff*